UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JENNIFER GRABOWSKI,

                              <span style="text-align:center">DECISION & ORDER</span>

                    Plaintiff,

                              16-CV-6513P

          v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,[1]

                    Defendant.
_____


## <u>PRELIMINARY STATEMENT</u>

          Plaintiff Jennifer Grabowski ("Grabowski") brings this action pursuant to Section

205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision

of the Commissioner of Social Security (the "Commissioner") denying her application for

Disability Insurance Benefits ("DIB").  Pursuant to 28 U.S.C. § 636(c), the parties have

consented to the disposition of this case by a United States magistrate judge.  (Docket # 7).

          Currently before the Court are the parties' motions for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 15, 18).  For the

reasons set forth below, this Court hereby vacates the decision of the Commissioner and remands

this claim for further administrative proceedings consistent with this decision.

---

[1] On January 23, 2017, after this appeal was filed, Nancy A. Berryhill became Acting Commissioner of
Social Security.

# BACKGROUND

## I.    Procedural Background

Grabowski protectively filed for DIB on April 14, 2013, alleging disability

beginning on August 2, 2012, due to stress, constant sickness, physical exhaustion, vertigo, and

underactive thyroid.  (Tr. 225, 228).[2]  On August 13, 2013, the Social Security Administration

denied Grabowski's claims for benefits, finding that she was not disabled.  (Tr. 100).  Grabowski

requested and was granted a hearing before Administrative Law Judge John R. Allen (the

"ALJ").  (Tr. 109-10, 130-34).  The ALJ conducted a hearing on October 7, 2014.  (Tr. 41-88).

During the hearing, Grabowski amended her alleged onset date to April 1, 2013.  (Tr. 175).

Grabowski was represented at the hearing by Andrew S. Youngman, a non-attorney

representative.  (Tr. 25).  Subsequent to the hearing, Grabowski's representative submitted

additional records to the ALJ, including records from Highland Family Medicine, University of

Rochester Medical Center's Physical Medicine and Rehabilitation Department, and Strong

Behavioral Health Clinic.  (Tr. 2, 367-507).  In a decision dated January 28, 2015, the ALJ found

that Grabowski was not disabled and was not entitled to benefits.  (Tr. 22-40).

On March 16, 2015, Grabowski's attorney, Ryan Bell, from Citizens Disability,

LLC, informed her that Citizens Disability would not represent her in connection with an appeal

of the unfavorable determination.  (Tr. 21).  On March 19, 2015, Christopher Pashler ("Pashler"),

Esq., notified the Appeals Council that he had recently been retained by Grabowski, submitted a

notice of appeal, and requested an additional forty-five days to submit a brief in support of the

appeal.  (Tr. 17).  On April 15, 2015, Pashler wrote to the Appeals Council indicating that he did

not have online access to the file and requesting an additional forty-five days.  (Tr. 14).  The

Appeals Council responded on April 16, 2015, granting an additional twenty-five days, but sent

_____

[2]  The administrative transcript shall be referred to as "Tr. __."

the extension to Grabowski's former representative. (Tr. 12). Grabowski wrote the Appeals Council on April 23, 2015, to advise that her current attorney of record was Pashler and that she was no longer represented by Citizens Disability. (Tr. 11). On April 25, 2015, Pashler requested a further extension of forty-five days. (Tr. 9). The Appeals Council granted a twenty-five day extension. (Tr. 7-8).

On June 1, 2015, Pashler submitted a brief in support of Grabowski's appeal. (Tr. 256-61). He also submitted additional medical records, including the results of an April 3, 2014, audiological examination performed at the University of Rochester (Tr. 2, 508-09), treatment records from Strong Behavioral Health dated March 6, 2015 through April 4, 2015, treatment records from University of Rochester Medical Center's Audiology Department dated December 11, 2015, and treatment records from the Monroe County Department of Human Services dated April 7, 2015. (Tr. 2). On June 22, 2016, the Appeals Council denied Grabowski's request for review of the ALJ's decision. (Tr. 1-6). Grabowski commenced this action on July 26, 2016, seeking review of the Commissioner's decision. (Docket # 1).

## II.   Relevant Medical Evidence[3]

### A.   Treatment Records

#### 1.   Grief and Trauma Recovery Counseling Centre

Treatment notes indicate that Grabowski initially met with Bonnie J. White ("White"), LMHC, at the Grief and Trauma Recovery Counseling Centre on August 9, 2012. (Tr. 264-66). Grabowski reported that she was suffering from extreme anxiety and feeling so overwhelmed that she could not work. (Tr. 263). During the appointment, Grabowski reported

---

[3] Those portions of the treatment records that are relevant to this decision are recounted herein.

that she had previously attempted suicide while under the influence of alcohol when she was approximately twenty.  (*Id.*).

Grabowski met with White again on August 22, 2012.  (Tr. 267-71).  The purpose of the appointment was to address Grabowski's reported intolerance to work and difficulty dealing with her caretaking responsibilities for her boyfriend, who was suffering from cancer.  (*Id.*).  According to Grabowski, her ability to perform daily and social activities had been affected by her symptoms, and she had been either late or absent from work unexpectedly approximately twenty times during the previous month.  (*Id.*).  Grabowksi reported that she had not worked since she began seeking treatment and she was functioning better while not at work.  (*Id.*).

Grabowski returned for an appointment with White on September 6, 2012.  (Tr. 271-75).  Grabowski completed a PCL-C evaluation, the results of which indicated that she met the criteria for Post-Traumatic Stress Disorder ("PTSD"), according to White.  (*Id.*).  Grabowski discussed her childhood and recalled living with different relatives, including her mother, father and grandmother.  (*Id.*).  According to Grabowski, she could recall the time she spent at her father's and grandmother's, but was unable to recall her mother's friends, although she remembered dreading them.  (*Id.*).  White speculated that Grabowski may have been traumatized or molested as a child.  (*Id.*).  Grabowski reported that her anxiety was triggered by sounds at the factory where she worked.  (*Id.*).  She also reported feeling overwhelmed caring for her sick boyfriend.  (*Id.*).

White assessed that Grabowski suffered from PTSD and dissociative disorder or reaction, unspecified.  (*Id.*).  White coordinated with Grabowski's primary care physician to address her mental health needs.  (*Id.*).  Her primary care physician reported that Grabowski had

quit her employment and indicated that she likely would need a psychiatric evaluation to confirm White's suspicions that Grabowski suffered from dissociative disorder. (*Id.*). White spoke to a nurse practitioner who was caring for Grabowski, and he reported that Grabowski was currently taking Clonazepam for anxiety and had previously been on Celexa. (*Id.*). White recommended an SSRI to address PTSD and a possible a trial of Buspar for the general anxiety symptoms. (*Id.*). She also recommended weekly therapy sessions. (*Id.*).

By letter dated January 23, 2013, White summarized her treatment of Grabowski, which ended after the September 6, 2012, session due to lack of insurance. (Tr. 263). White indicated that she had advised Grabowski that she was unable to tolerate her current job and should attempt to find less stressful work. (*Id.*). On June 4, 2013, White indicated that although she was not qualified to diagnose Grabowski, she suspected that Grabowski suffered from some type of dissociative disorder and noted that a psychologist or psychiatrist would have to evaluate Grabowski to determine if she was disabled from employment. (Tr. 262).

### 2.      Lifetime Health Medical Group

On February 3, 2013, Grabowski treated with physician assistant Shawn Ross ("Ross"), PA, at the Lifetime Health Medical Group. (Tr. 278-80). During the visit, Grabowski complained of congestion, dizziness, plugged ears, nausea, and sinus pain. (*Id.*). Ross assessed that she suffered from sinusitis and vertigo. (*Id.*).

### 3.      Highland Family Medicine

Treatment records indicate that on May 10, 2013, Grabowski met with Lori G. Conway ("Conway"), NP, at Highland Family Medicine to establish care. (Tr. 325-29). During the visit, Grabowski complained of fatigue, a plugged ear, and nasal congestion. (*Id.*). Grabowski reported that she had recently quit her job as a housecleaner as a result of fatigue,

despite working only about thirty-four hours per week. (*Id.*). She indicated that she previously had been employed for approximately twelve years in printing, but had to leave the job because it was too stressful. (*Id.*). She was currently engaged in photography on a part-time basis. (*Id.*). Grabowski indicated that her fatigue was a major source of stress and that she frequently suffered from ear infections. (*Id.*).

Conway assessed that Grabowski suffered from hypothyroidism, anxiety, fatigue, right-sided chest wall pain, recurrent cold sores, allergic rhinitis, and stress due to her boyfriend's illness. (*Id.*). She ordered bloodwork and prescribed Celexa for anxiety and Claritin for allergies. (*Id.*). Conway also increased the dosage of Levothyroxine, which was prescribed to address Conway's hypothyroidism. (*Id.*). She recommended that Grabowski engage in supportive counseling to address issues stemming from her boyfriend's illness. (*Id.*).

Grabowski returned for an appointment with Conway on July 2, 2013. (Tr. 317-25). She continued to complain of daily fatigue that interfered with her ability to work. (*Id.*). Grabowski also indicated that she experienced stress and anxiety due to her boyfriend's illness. (*Id.*). Grabowski scored thirteen on the Generalized Anxiety Disorder ("GAD") assessment and on the Patient Health Questionnaire ("PHQ-9"), which assesses depression severity. (*Id.*). Conway advised Grabowski to continue taking Citalopram, keep a daily schedule even when not working, engage in supportive counseling, and follow up in two months. (*Id.*).

On September 17, 2013, Grabowski attended another appointment with Conway. (Tr. 310-17). She continued to complain of severe, disabling fatigue, which she had been experiencing for the previous three years, and muscle aches in her legs and feet. (*Id.*). Grabowski reported difficulty sleeping. (*Id.*). She indicated that her mood and energy had not improved since her last appointment, although she had started counseling. (*Id.*). She also

reported hearing loss.  (*Id.*).  Grabowski reported that she had applied for disability benefits, but had been denied, and she requested that Conway complete paperwork relating to her claim.  (*Id.*).  Grabowski disclosed that her previous doctor had not indicated that she was physically disabled.  (*Id.*).  Conway reviewed Grabowski's lab results and determined that there was no active disease, although she indicated that chronic fatigue syndrome and fibromyalgia should be considered.  (*Id.*).  She also assessed that Grabowski suffered from depressive disorder, not elsewhere classified, prescribed Venlafaxine, and encouraged better sleep hygiene and increased exercise.  (*Id.*).

Grabowski returned for another appointment on October 25, 2013.  (Tr. 307-10).  She complained of continued fatigue, depression, anxiety, and joint, back, and hip pain.  (*Id.*).  She reported that she was not on a sleep schedule and that her fatigue was worse with physical activity.  (*Id.*).  Grabowski indicated that ibuprofen helped alleviate her pain.  (*Id.*).  Upon examination, Conway noted no trigger point tenderness in Grabowski's back, although her right hip was positive for pain with internal and external rotation, and the straight leg raise test was limited to thirty degrees.  (*Id.*).  Conway assessed that Grabowski did not meet the criteria for fibromyalgia and that many of her complaints were related to her depression, anxiety, and the stress of caring for a loved one suffering from cancer.  (*Id.*).  She prescribed Nortriptyline for depression and anxiety and ordered imaging of Grabowski's right hip.  (*Id.*).  Conway encouraged Grabowski to walk at least fifteen minutes a day and to maintain a regular meal, and sleeping and waking schedule.  (*Id.*).

Approximately one month later, on November 21, 2013, Grabowski attended another appointment with Conway.  (Tr. 302-06).  During the appointment, Grabowski complained of stress, anxiety, depression, and interrupted sleep.  (*Id.*).  She also reported

difficulty driving on busy roads. (*Id.*). According to Grabowski, she suffered from muscle soreness, back pain, pain in her legs and hips, and stiffness when she awakens. (*Id.*). Conway restarted Grabowski on Citalopram to address her depression and advised her to continue taking Nortriptyline at night to assist with sleep and to continue counseling. (*Id.*). Conway assessed that Grabowski's fatigue was related to her depression, anxiety, and overall physical decondition. (*Id.*). Conway suggested that Grabowski also might suffer from fibromyalgia, but noted that she did not demonstrate trigger points. (*Id.*). Imaging of Grabowski's hips were negative for abnormalities. (*Id.*). Conway referred Grabowski to Physical Medicine and Rehabilitation for further evaluation. (*Id.*).

On December 11, 2013, Grabowski attended another appointment with Conway. (Tr. 297-302). Grabowski reported continued depression, although her mood had slightly improved, feeling overwhelmed, pain in her low back, hip and thigh, and continued fatigue. (*Id.*). She indicated that she was unable to work full-time on a sustained basis, but would like to work approximately twenty to twenty-five hours per week, although she thought she would have difficulty performing physical work and had limitations concentrating and attending to specific tasks. (*Id.*). Upon examination, Conway noted tenderness in Grabowski's lower back and lateral thighs, but normal range of motion in her hips, knees, and feet. (*Id.*). She assessed that Grabowski might suffer from fibromyalgia or simple deconditioning, as well as depression, anxiety, and possible PTSD related to caring for her ill boyfriend. (*Id.*). Conway encouraged Grabowski to maintain good sleep hygiene, to walk, to perform regular household and daily activities, and to continue with her mental health counseling and medication. (*Id.*). Conway also completed DSS paperwork recommending a part-time workweek with weight limitations for pushing, pulling and lifting, avoidance of high stress jobs. (*Id.*).

Grabowski attended another appointment with Conway approximately one month later on January 17, 2014. (Tr. 294-97). She informed Conway that she continued to see a counselor, but had requested to be transferred to a female counselor. (*Id.*). She also indicated that her fatigue and hip pain had worsened during the prior weeks. (*Id.*). Conway completed a DSS form indicating that Grabowski was unable to work for six months due to her medical conditions. (*Id.*). She reviewed the evaluation completed by Physical Medicine and Rehabilitation and agreed that physical therapy would improve Grabowski's muscle strength and decrease her hip pain. (*Id.*). Conway opined that Grabowski's fatigue was likely situational and related to her depression, but she referred her for a sleep study to rule out other causes. (*Id.*). She noted that Dr. Sidhu did not think that Grabowski suffered from fibromyalgia, although she believed she might have chronic fatigue syndrome. (*Id.*). Additionally, she noted that Grabowski's PHQ-9 score had improved. (*Id.*).

On February 18, 2014, Grabowski returned to Conway's office for a follow-up appointment. (Tr. 394-98). During the appointment, Grabowski continued to complain of fatigue and muscle pain in her hips, feet, lower back, and thighs. (*Id.*). She also indicated that she had been suffering from nasal congestion and rhinitis. (*Id.*). Conway noted that Grabowski's depression and anxiety were markedly improved since her previous visit, and Grabowski reported that she had met with a new, female counselor. (*Id.*). Conway advised Grabowski to continue physical therapy. (*Id.*). She noted that Grabowski might suffer from chronic fatigue, although the results of a sleep study were pending, and indicated that she would consider referring Grabowski to rheumatology for further evaluation if the sleep study results were normal. (*Id.*).

During a follow-up appointment on April 22, 2014, Grabowski reported increased fatigue and stress. (Tr. 390-94). She believed that her increased stress caused her to experience increased pain in her feet, legs, and hips. (*Id.*). Conway noted that the sleep study showed that Grabowski did not have an obstruction and that Grabowski would be following up with the sleep center for sleep hygiene recommendations. (*Id.*). Conway referred Grabowski for vocational rehabilitation and noted that Grabowski would be unable to tolerate a job involving repetitive motion. (*Id.*). Grabowski requested that Conway complete a disability evaluation form, but Conway advised Grabowski to attempt to gauge her ability to engage in physical activity in order to complete the form. (*Id.*). If Grabowski reported she was unable to do any activity listed on the form, Conway would recommend a functional evaluation from a physical therapist. (*Id.*).

Grabowski returned for an appointment with Conway on May 13, 2014. (Tr. 376-90). Grabowski's PHQ-9 and GAD scores were much improved, and the results from the sleep study had demonstrated that she did not suffer from any major sleep disorder or sleep apnea. (*Id.*). Grabowski reported that she was exercising daily at home and was walking her dog approximately twenty minutes every day. (*Id.*). She continued to complain of leg, back and knee pain, particularly in the morning. (*Id.*). Conway assessed that Grabowski's depression and anxiety were improving with therapy and medication, and that fatigue continued to be a severe problem for her. (*Id.*). Conway indicated that Grabowski "may truly be suffering from chronic fatigue syndrome." (*Id.*). She encouraged Grabowski to continue her efforts to increase her activity and to follow up with Physical Medicine and Rehabilitation. (*Id.*). Conway completed forms for Grabowski's attorneys indicating that Grabowski could engage in low-stress, part-time employment that did not involve physical activity, as full-time work would be difficult for Grabowski. (*Id.*).

On July 17, 2014, Grabowski attended another appointment with Conway. (Tr. 371-76). Grabowski reported that she felt that her depression and anxiety had improved and that she had been attending a guided meditation class, which was helpful. (*Id.*). Her PHQ-9 score was ten, and her GAD score was four. (*Id.*). Conway agreed with the report from Physical Medicine and Rehabilitation that Grabowski should be referred to rheumatology for further evaluation and noted again that Grabowski "likely has true chronic fatigue." (*Id.*).

Grabowski returned for an appointment with Conway on September 9, 2014. (Tr. 367-71). During the appointment, Grabowski complained of migraine headaches with visual auras. (*Id.*). She also complained of ongoing allergies, fatigue, and body aches. (*Id.*). Upon examination, Conway noted no point tenderness in Grabowski's back. (*Id.*). Conway indicated that Grabowski would be evaluated by a rheumatologist for her fatigue, and she increased her Cymbalta dosage and decreased her Pamelor dosage. (*Id.*).

## 4. **Strong Memorial Hospital Behavioral Health Department**

On September 3, 2013, Grabowski met with Brian Wade Turnipseed ("Turnipseed"), a psychological therapist with Strong Memorial Hospital's Behavioral Health Department. (Tr. 482-93). Grabowski reported that she had suffered from depression beginning when she was approximately twenty-one, at which time she was hospitalized for a suicide attempt. (*Id.*). She endorsed current feelings of depression, irritability, and exhaustion. (*Id.*). Grabowski indicated that she had previously been employed for approximately twelve years at a printing business, which caused her stress, anxiety, and fatigue. (*Id.*).

According to Grabowski, for the previous twelve years, she had lived with her boyfriend, who had been suffering from cancer for the last six years. (*Id.*). Grabowski was her boyfriend's caregiver, causing her to be irritable and emotional. (*Id.*). Grabowski indicated that

she was undertaking house projects to prepare to sell their house because they were no longer working.  (*Id.*).

Grabowski scored fifteen on the GAD-7, indicating a moderate range of anxiety. (*Id.*).  She endorsed nervousness, excessive worry, difficulty relaxing, restlessness, and irritability.  (*Id.*).  She also reported feeling anxious in public settings.  (*Id.*).  Turnipseed assessed that she suffered from Adjustment Disorder with Anxiety and assessed a Global Assessment of Functioning ("GAF") of 55.  (*Id.*).  He recommended weekly or biweekly psychotherapy sessions and medication management as directed by Conway.  (*Id.*).

Grabowski met with Turnipseed for a therapy session on October 1, 2013. (Tr. 494-95).  During the session, Grabowski complained of lack of energy and chronic fatigue. (*Id.*).  She also endorsed several stressors, including her grandfather's chronic illness, her boyfriend's illness, and the need for frequent healthcare appointments for herself and her boyfriend.  (*Id.*).  Grabowski informed Turnipseed that attending sessions at Strong increased her anxiety, particularly because parking was difficult, and requested that her appointments be moved to Highland Family Medicine.  (*Id.*).  She also complained of ongoing financial stressors. (*Id.*).  Turnipseed agreed to move her sessions to Highland Family Medicine.  (*Id.*).

On October 16, 2013, Grabowski met with Turnipseed at Highland Family Medicine.  (Tr. 499-500).  She reported that the new location was much easier for her.  (*Id.*). Grabowski reported feeling weaker and more fatigued, and experiencing trouble with her hearing.  (*Id.*).  Although she recently had a hearing test, she did not have confidence in the results.  (*Id.*).  According to Grabowski, she occasionally felt dizzy or off-balance in public. (*Id.*).  She reported that her current focus was on learning new skills and finding a new job, but expressed some concern regarding her mental capacity.  (*Id.*).

Treatment notes indicate that Grabowski met with Turnipseed on December 2, 2013, and that he completed DSS paperwork for Grabowski two days later. (Tr. 504-05). Additional notes indicate that Grabowski requested to be transferred to a female therapist, and her case was transferred to Kaitlin Fitzgerald. (*Id.*).

### 5. Physical Medicine and Rehabilitation

Treatment records indicated that Grabowski attended an appointment with Kamaljit K. Sidhu ("Sidhu"), MD, and Brett Teran ("Teran"), DO, a medical resident, at University of Rochester Medical Center's Physical Medicine and Rehabilitation Department on December 31, 2013. (Tr. 472-76). Grabowski complained of extreme fatigue and pain in her back, hips, and legs that had persisted for over three years. (*Id.*). She indicated that she took ibuprofen to alleviate her pain and had been prescribed Nortriptyline to assist with sleep. (*Id.*). She also endorsed migraines and a history of depression, and indicated that her depression was stable with Celexa. (*Id.*). She also complained of difficulty hearing, maintaining sleep, and weight gain during the previous year. (*Id.*). Grabowski reported that she had been employed as a cleaner until she quit her job approximately six months earlier due to fatigue and pain. (*Id.*).

Upon examination, Grabowski demonstrated minimal tender spots, and a fibromyalgia screen was negative. (*Id.*). She exhibited decreased range of motion in her hips due to tightness. (*Id.*). Teran and Sidhu noted that Grabowski's "symptoms do not fit into the category of fibromyalgia and are more likely consistent with musculoskeletal or localized musculoskeletal pain." (*Id.*). They recommended that Grabowski attend physical therapy to address her bilateral thigh pain and to strengthen and stretch her hip, buttock, and thigh muscles. (*Id.*). They also recommended that she be evaluated for sleep apnea or other sleep disorders that could be causing her chronic fatigue. (*Id.*). They noted that if that evaluation were negative,

"she may need a referral to [r]heumatologist for further evaluation/management of chronic fatigue syndrome." (*Id.*).

Grabowski returned for a follow-up appointment and met with Claudia Ramirez, MD, and Sidhu on March 25, 2014. (Tr. 478-80). Grabowski complained that her fatigue had worsened since her last appointment. (*Id.*). She also complained of thigh and back pain. (*Id.*). Grabowski was scheduled for a sleep study on March 27, 2014; the providers again noted that if the results were negative, they would consider a referral to a rheumatologist for evaluation of chronic fatigue syndrome. (*Id.*). They noted that the "etiology of her pain is unclear at this point." (*Id.*). They recommended that Grabowski continue her exercises and they would discuss returning to physical therapy to review her current exercises. (*Id.*).

On July 15, 2014, Grabowski met with Sidhu for a follow-up appointment. (Tr. 480-81). The treatment records indicate that the results of the sleep study were negative and that Grabowski reported that she continued to suffer from fatigue and hip pain. (*Id.*). Grabowski reported that she had been attempting to walk more frequently, but continued to become fatigued, and that stress triggered her pain and fatigue. (*Id.*). She also reported attending one physical therapy session and performing strength and stretching exercises at home on a daily basis. (*Id.*). She recommended light exercises for approximately thirty minutes at least three times per week, identified particular exercises to address Grabowski's left hip pain and range of motion, and offered a referral to physical therapy, which Grabowski declined. (*Id.*). Sidhu emphasized the importance of maintaining her activity level "despite chronic fatigue syndrome." (*Id.*). Sidhu's notes indicate "[r]eferral to rheumatology for further evaluation/treatment as appropriate." (*Id.*).

### 6.    URMC Sleep Disorders Center

On March 27, 2014, Grabowski met with Donald W. Greenblatt ("Greenblatt"), MD, at the URMC Sleep Disorders Center to evaluate whether she suffered from a sleep disorder.  (Tr. 358-60).  Grabowski reported poor sleep and not feeling refreshed upon awakening.  (*Id.*).  She indicated that she napped during the day and had problems with concentration, memory, and attention span.  (*Id.*).  Greenblatt recommended that she complete an overnight polysomnogram to determine if she suffered from any qualitative sleep disturbance that could be contributing to fatigue.  (*Id.*).  The study, which was conducted on April 8, 2014, demonstrated a relative decrease in sleep efficiency with a reduced amount of REM sleep, but no significant respiratory events, changes in oxyhemoglobin saturation, or any other primary sleep pathology.  (Tr. 361-66).

### 7.    URMC Audiology at Highland Hospital

On April 3, 2014, Grabowski underwent an audiological evaluation.  (Tr. 508-09). The results indicated borderline normal hearing sensitivity with mild sensorineural hearing loss. (*Id.*).  According to the audiologist, Grabowski's borderline normal/mild hearing loss might cause her to experience difficulty understanding speech in the presence of noise or speech at a distance, but she was not a candidate for amplification.  (*Id.*).  The audiologist recommended that Grabowski use hearing protection in the presence of loud noise.  (*Id.*).

### B.    Medical Opinions

### 1.    Yu-Ying Lin, PhD

On July 8, 2013, state examiner Yu-Ying Lin ("Lin"), PhD, conducted a consultative psychiatric evaluation of Grabowski.  (Tr. 285-89).  Grabowski reported that she currently lived with her boyfriend and drove herself to the appointment.  (*Id.*).  Grabowski also

reported that she had graduated from high school in a regular education setting. (*Id.*). Grabowski was currently working part-time as a Little League photographer and had previously been employed as a housekeeper, but had quit due to health issues and stress. (*Id.*).

According to Grabowski, she had difficulty sleeping. (*Id.*). Grabowski reported depressive symptoms for the previous two years, including dysphoric moods, crying spells, fatigue, diminished self-esteem, diminished sense of pleasure, and social withdrawal. (*Id.*). Grabowski also reported anxiety for the same period, including excessive worry, fatigue, irritability, restlessness, difficulty concentrating, and hyperstartle response. (*Id.*). Although she initially reported that her anxiety symptoms occurred occasionally, she later indicated that her anxiety was more "prevalent" than her depression. (*Id.*). Grabowski also endorsed panic symptoms without identifiable triggers, including palpitations, sweating, and derealization, approximately once a week. (*Id.*). Grabowski indicated that her primary stressors were her health problems, her boyfriend's health problems, and her finances. (*Id.*). She also reported that she suffered from memory difficulties. (*Id.*).

Grabowski reported that she was able to care for her personal hygiene and manage household chores, including cooking, cleaning, laundry, and shopping, although feelings of weakness and dizziness sometimes made completing those tasks difficult. (*Id.*). She reported that she was able to manage her finances, but sometimes "maxe[d] out" on her credit cards. (*Id.*). Grabowski reported that she had good relationships with her family and friends, but that they did not assist her. (*Id.*). She was able to drive and spent her day caring for her boyfriend and pets and watching television. (*Id.*).

Upon examination, Lin noted that Grabowski appeared her stated age, was casually dressed and well-groomed, and had normal motor behavior and eye contact. (*Id.*). Lin

opined that Grabowski had fluent, clear speech with adequate language, coherent and goal-directed thought processes, full range but slightly anxious affect, neutral mood, clear sensorium, full orientation, and average intellectual functioning with a general fund of information that was appropriate to experience. (*Id.*). Lin noted that Grabowski's attention and concentration were mildly impaired due to anxiety in the evaluation. (*Id.*). Grabowski was able to perform simple counting and calculations, but had some difficulty with the serial three exercise. (*Id.*). According to Lin, Grabowski's recent and remote memory skills were moderately impaired due to evaluation anxiety. (*Id.*). Grabowski could recall three out of three objects immediately and two out of three objects after delay, and could complete five digits forward and three digits backward. (*Id.*).

Lin opined that Grabowski could follow and understand simple directions, perform simple tasks independently, make appropriate decisions, and relate adequately with others. (*Id.*). Lin further opined that Grabowski was mildly limited in maintaining attention and concentration, mildly to moderately limited in maintaining a regular schedule, and moderately to markedly limited in appropriately dealing with stress. (*Id.*). Lin opined that the results of Grabowski's examination were consistent with psychiatric problems, but did not appear to be significant enough to interfere with her ability to function on a daily basis. (*Id.*). She diagnosed Grabowski with anxiety disorder, not otherwise specified, and depressive disorder, not otherwise specified. (*Id.*).

### 2.    **Harbinder Toor, MD**

On July 8, 2013, state examiner Harbinder Toor ("Toor"), MD, conducted a consultative internal medicine examination. (Tr. 290-93). Grabowski reported suffering from an underactive thyroid, extreme exhaustion and weakness, and a history of frequent illness,

including ear infections, colds, and flu.  (*Id.*).  She reported experiencing vertigo occasionally, but denied experiencing any pain, numbness, or weakness.  (*Id.*).  Grabowski also reported suffering from depression and anxiety.  (*Id.*).

Grabowski reported that she was able to care for her personal hygiene, cook and clean as needed, do laundry twice a week, and shop once a week.  (*Id.*).  Grabowski reported that she enjoyed watching television and engaged in photography as a hobby.  (*Id.*).

Upon examination, Toor noted that Grabowski had a normal gait and did not appear to be in acute distress.  (*Id.*).  She was able to complete the heel and toe walking without difficulty and could squat fully.  (*Id.*).  She used no assistive devices, did not need assistance to change for the examination or to get on and off the examination table, and had no difficulty rising from the chair.  (*Id.*).

Toor noted that Grabowski's cervical and lumbar spine showed full flexion, extension, lateral flexion bilaterally, and rotary movement bilaterally.  (*Id.*).  The straight leg raise was negative, and Grabowski demonstrated full range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally.  (*Id.*).  Toor assessed that Grabowski's hand and finger dexterity were intact and her grip strength was five out of five bilaterally.  (*Id.*).  Toor indicated that Grabowski did not have any limitation for gross or fine motor activity and that no other physical medical limitations were suggested by the examination.  (*Id.*).

### 3.      E. Kamin, PhD

On July 18, 2013, agency medical consultant E. Kamin ("Kamin"), PhD, completed a Psychiatric Review Technique.  (Tr. 94).  Kamin concluded that Grabowski's mental impairments did not meet or equal a listed impairment.  (*Id.*).  According to Kamin, Grabowski suffered from no limitations in her activities of daily living and mild limitations in

her ability to maintain social functioning, concentration, persistence and pace. (*Id.*). In addition, according to Kamin, Grabowski had not suffered from repeated episodes of deterioration. (*Id.*). Kamin completed a mental residual functional capacity ("RFC") assessment. (Tr. 96-97). Kamin opined that Grabowski suffered from moderate limitations in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. (*Id.*).

### 4. Kaitlin Fitzgerald and Barbara Gawinski, PhD

On May 13, 2014, Kaitlin Fitzgerald ("Fitzgerald")[4] completed a Monroe County Department of Human Services Psychological Assessment for determination of employability form relating to Grabowski. (Tr. 346-49). The form was reviewed and signed by Barbara Gawinski ("Gawinski"), PhD. (*Id.*). Fitzgerald indicated that she had been providing treatment to Grabowski for approximately three months and had evaluated her on six occasions. (*Id.*). According to Fitzgerald, Grabowski complained of anxiety and depression secondary to her chronic pain, fatigue, undiagnosed medical conditions, and financial distress. (*Id.*). Fitzgerald diagnosed Grabowski with adjustment disorder with mixed anxiety and depressed mood, and rule out general anxiety disorder, and assessed a GAF of 52. (*Id.*).

---

[4] The record suggests that Kaitlin Fitzgerald also used the name Kaitlin K. Porpigila. (Tr. 357). For ease of reference, this decision will refer to her as "Fitzgerald."

Using a checklist chart on the form, Fitzgerald indicated that Grabowski was very limited[5] in her ability to follow, understand, and remember simple instructions and directions, and maintain attention and concentration for role tasks. (*Id.*). She also opined that Grabowski was moderately limited[6] in her ability to regularly attend to a routine and maintain a schedule. (*Id.*). According to Fitzgerald, there was no evidence of any limitation in Grabowski's ability to perform simple and complex tasks independently, maintain basic standards of hygiene and grooming, and perform low stress and simple tasks. (*Id.*). Fitzgerald opined that Grabowski would be unable to participate in any activities except individual psychotherapy for the following six months. (*Id.*).

On September 23, 2014, Fitzgerald completed a mental health questionnaire relating to Grabowski, which was reviewed and signed by Gawinski and Holly Russell, MD. (Tr. 355-57). On the form, Fitzgerald diagnosed Grabowski with generalized anxiety disorder, characterized by anhedonia, appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, motor tension, autonomic hyperactivity, apprehensive expectation, vigilance and scanning, poor memory, irritability, somatization unexplained by organic disturbance, and social withdrawal or isolation. (*Id.*). According to Fitzgerald, Grabowski was frequently worried and focused on her health. (*Id.*). Fitzgerald had insufficient evidence to opine as to whether Grabowski suffered from limitations in her activities of daily living, but opined that she suffered from extreme[7] deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and

---

[5] "Very limited" was defined to mean unable to function twenty-five percent or more of the time. (*Id.*).

[6] "Moderately limited" was defined to mean unable to function ten to twenty-five percent of the time. (*Id.*).

[7] "Extreme" was defined to mean "severe impairment of ability to function." (*Id.*).

marked[8] difficulties in maintaining social functioning.  (*Id.*).  Fitzgerald further opined that Grabowski suffered from extreme episodes of deterioration or decompensation in work or work-like settings that caused her to withdraw from the situation or to experience an exacerbation of symptoms.  (*Id.*).  According to Fitzgerald, Grabowski would likely be absent from work more than four days per month.  (*Id.*).

### III.   <u>Non-Medical Evidence</u>

During the administrative hearing, Grabowski testified that she was forty-two years old and lived with her boyfriend, who was disabled with cancer.  (Tr. 47, 67-68).  Grabowski testified that she had graduated from high school.  (Tr. 48).  Grabowski testified that she was a licensed driver, although she indicated she got very anxious driving, especially in heavy traffic on highways.  (Tr. 47-48).

Grabowski testified that her last full-time job was with a printing company, where she had worked operating machines.  (Tr. 48-49, 59-61).  She indicated that she stopped working in April 2013 because of problems with stress and fatigue and frequent physical illnesses.  (Tr. 48-49).  According to Grabowski, "[I]t got so bad that I actually had to be pulled out of work[;] I actually started crying and couldn't stop from all the stress."  (Tr. 49).  After that, she tried working part-time (20 to 25 hours a week) as a housekeeper at a hotel.  (Tr. 49, 52).  Grabowski explained that she could not keep up with that job either because she was "so exhausted and again getting sick" that she was frequently absent.  (Tr. 49-50).  Since she stopped working, she had fewer illnesses, although she still got "very fatigued" and anxious and sometimes experienced dizziness and balance problems.  (Tr. 50).  Grabowski testified that

---

[8] "Marked" was defined to mean "an impairment which seriously affects ability to function independently, appropriately, and effectively."  (*Id.*).

before her job with the printing company, she had worked at Xerox, assembling small parts of printing machines that were wheeled to her on a cart at her duty station. (Tr. 55-58).

With respect to physical symptoms, Grabowski testified that for the past three years she had daily intermittent pain in her hip, legs, arms, neck – "all over really." (Tr. 51-52). According to Grabowski, the pain increased with activity, and her doctors had been unable to identify the cause. (Tr. 51). She testified that they were still trying to determine the cause. (*Id.*).

Grabowski indicated that she treated with her primary care physician every six to eight weeks and her mental health therapist every other week. (Tr. 62-63). According to Grabowski, she began treating with her therapist approximately a year earlier. (Tr. 63). Upon hearing that testimony, the ALJ asked Grabowski's representative, "[D]o we have those records? I'm looking for them." (*Id.*). The representative reviewed the exhibits and acknowledged that the records did not appear to be complete. (*Id.*). The following exchange occurred:

> ALJ:     Okay. Counsel, I'm going to want those.
>
> [REPRESENTATIVE]:     Yes, your honor.
>
> ALJ:     So I'll hold the record open 30 days to get those.

(*Id.*).

The ALJ returned to the subject of the type of treatment Grabowski had received. (Tr. 63-64). Grabowski testified that she took prescribed medication for her thyroid issues, depression and anxiety, and sleep and pain. (Tr. 64). She testified that she also had participated in physical therapy and a sleep study. (*Id.*).

With respect to physical limitations, Grabowski testified that she could stand for about twenty or thirty minutes before needing to sit down, walk about fifteen minutes, and comfortably lift about five pounds due to weakness in her shoulder and arms. (Tr. 65-66).

Grabowski explained that her physicians "want to refer me to a rheumatologist" to try to determine the cause of her pain. (Tr. 67).

In response to the ALJ's question about her current mental condition and "mood," Grabowski testified, "I'd say my mood is, like – how do you call it, like lack of motivation type of – lack of interest type thing. I snap kind of easy at things." (*Id.*). She indicated that she recently changed mental health medication because she "couldn't stop crying" and "[e]verything upset [her]." (Tr. 74). According to Grabowski, the new medication appeared to help reduce the crying spells, although she testified that she still "snap[s] real easy." (*Id.*). In addition to anxiety caused by driving, Grabowski explained that she sometimes experienced anxiety in stores, resulting in dizziness and a need to leave. (Tr. 75). Grabowski testified that she was trying to learn breathing techniques to address her anxiety and calm her down. (*Id.*). According to Grabowski, she did not sleep well "at all" and felt as if she could not remember or retain anything. (Tr. 68).

Grabowski testified that she prepared her own meals, went grocery shopping, cleaned the house, although she indicated that she got overwhelmed by the cleaning and was "always behind," and sometimes socialized with her family. (Tr. 69-70). She typically spent her day watching television, sitting outside, and resting. (Tr. 70-71). She estimated that she spent a total of four hours between 9 a.m. and 5 p.m. lying down. (Tr. 73-74).

Vocational expert Joyce Ryan ("Ryan") also testified during the hearing. (Tr. 76-87). The ALJ first asked Ryan to characterize Grabowski's previous employment. (Tr. 78-79). The ALJ then asked Ryan whether a person would be able to perform Grabowski's previous jobs who was the same age as Grabowski, with the same educational and vocational profile, and who was able to perform the full range of light work, but was limited to lifting

occasionally twenty pounds; lifting frequently ten pounds; sitting, standing and walking six hours in an eight-hour workday; occasional climbing steps and ramps, balancing, kneeling, stooping, crawling, crouching; who must avoid exposure to workplace hazards; and would be precluded from climbing ladders, ropes, or scaffolds; and could only perform simple, routine, repetitive tasks, and follow simple instructions and directions; only perform simple tasks independently; only engage in "low stress activities," meaning no production quota or fast-paced assembly; only experience occasional changes in work structure and routine; and only have superficial interaction with the public. (Tr. 79-80). Ryan testified that such an individual would be able to perform only one job of Grabowski's past relevant work – that of assembler of small products – but would be able to perform other positions available in the national and local economy, including the positions of cleaner, mailroom sorter, and photocopy machine operator. (Tr. 80-82).

The ALJ then asked Ryan to assume an individual with the same limitations, with the additional limitation that the individual would need to take a thirty to sixty minute break in the morning and in the afternoon. (Tr. 82). Ryan testified that such an individual would be precluded from competitive employment. (*Id.*).

Finally, the ALJ asked Ryan to assume an individual with the same non-exertional limitations but without exertional limitations, and to assume the need for additional breaks described in the second hypothetical. (Tr. 83). Ryan testified that such an individual would also be precluded from competitive employment. (*Id.*).

After Grabowski's representative questioned Ryan, the ALJ stated:

I'm going to hold the record open for 30 days for receipt of the therapist notes. I'd like to have the whole year's worth of treatment and all I've got is from 2013 in December and that's all I have. So if you could get those to us I'll hold the record open.

> After I get those[,] I'll try and sort through the medical records.
> And then think carefully about what you've told me. . . . It will be
> a little bit longer for me to get you a decision because we have to
> get the medical records.

(Tr. 87). Grabowski responded, "Okay," and her representative responded, "Thank you, your

honor." (*Id.*).


**DISCUSSION**

I.    **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Brault*

*v. Soc. Sec. Admin.*, 683 F.3d 443, 447 (2d Cir. 2012) ("[i]t is not our function to determine

*de novo* whether [a plaintiff] is disabled[;] . . . [i]nstead, we conduct a plenary review of the

administrative record to determine if there is substantial evidence, considering the record as a

whole, to support the Commissioner's decision and if the correct legal standards have been

applied") (internal citation and quotations omitted). Pursuant to 42 U.S.C. § 405(g), a district

court reviewing the Commissioner's determination to deny disability benefits is directed to

accept the Commissioner's findings of fact unless they are not supported by "substantial

evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if

supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as

"more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

> (1)     whether the claimant is currently engaged in substantial gainful activity;
>
> (2)     if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)     if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)     if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.     **The ALJ's Decision**

In his decision, the ALJ applied the required sequential analysis for evaluating disability claims.  (Tr. 25-36).  Under step one, the ALJ found that Grabowski had not engaged in substantial gainful activity since April 1, 2013, the alleged onset date.  (Tr. 27).  At step two, the ALJ concluded that Grabowski had the severe impairments of anxiety and depression. (Tr. 27-28).  The ALJ further concluded that Grabowski's complaints of fatigue, vertigo, and diffuse musculoskeletal problems were "not medically determinable" impairments "on this record."  (Tr. 28).  At step three, the ALJ determined that Grabowski did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments. (Tr. 28-29).  With respect to Grabowski's mental impairments, the ALJ found that Grabowski suffered from mild difficulties in performing daily activities, and moderate difficulties in maintaining social functioning, and concentration, persistence, and pace.  (Tr. 28-29).  The ALJ concluded that Grabowski retained the ability to perform simple, routine and repetitive jobs at all exertional levels, provided she was limited to low stress work ("no high production quotas or

fast-paced assembly lines"), no more than superficial contact with the public, and little change in work structure or routine. (Tr. 30). The ALJ found that Grabowski could follow and understand simple directions and instructions and perform simple tasks independently. (*Id.*). At step four, the ALJ determined that Grabowski was able to perform her former work as an assembler of small products, light exertional level, svp 2. (Tr. 35). Accordingly, the ALJ found that Grabowski was not disabled. (*Id.*).

### B. Grabowski's Contentions

Grabowski contends that the ALJ's determination that she was not disabled is not supported by substantial evidence and is the product of legal error. (Docket # 14). Grabowski contends that remand is appropriate pursuant to sentence four of 42 U.S.C. § 405(g) because the ALJ failed to meet his duty to develop the record by attempting to obtain Grabowski's mental health treatment records from Fitzgerald and Gawinski, the absence of which created a gap in the record. (*Id.* at 21-23). Grabowski argues that the ALJ's failure in this respect was especially detrimental because he discounted Gawinski and Fitzgerald's opinions on the grounds that they were not supported by treatment notes. (*Id.* at 22). Grabowski further contends that remand is also appropriate pursuant to sentence six of 42 U.S.C. § 405(g). (*Id.* at 18-20).

Grabowski also argues that the ALJ erred in concluding that her complaints of chronic fatigue did not constitute a medically determinable impairment. (*Id.* at 28-31). In addition to the step two challenge, Grabowski contends that the ALJ erred at step four in determining that she could return to her prior work as an assembler of small parts because he did not consider how stress would affect her ability to meet the demands of that position. (*Id.* at 23-27). Finally, Grabowski argues that the ALJ's decision is not supported by substantial evidence because new and material evidence submitted to the Appeals Council, namely,

audiological testing results, undercuts the determination that she could perform that past work. (*Id.* at 27-28).

## II.    Analysis

Grabowski maintains that remand is required because the ALJ failed to properly develop the administrative record by obtaining treatment records kept by Fitzgerald and Gawinski.  (*Id.* at 21-23).  Grabowski argues this omission created an obvious gap in the administrative record, which "had a profound impact on the outcome of this case," because the absence of those treatment records led the ALJ to improperly discount the providers' opinions that Grabowski suffered from some substantial work-related limitations.  (*Id.* at 21-22).

"It is well established in the Second Circuit that an ALJ is under an obligation to develop the administrative record fully, to ensure that there are no inconsistencies in the record that require further inquiry, and to obtain the reports of treating physicians and elicit the appropriate testimony during the proceeding." *Martello v. Astrue*, 2013 WL 1337311, *3 (W.D.N.Y. 2013).  Given the non-adversarial nature of a Social Security hearing, "[t]he duty of the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011) (quoting *Butts*, 388 F.3d at 386).  Accordingly, before determining whether the ALJ's conclusions are supported by substantial evidence, a court must first evaluate whether the claimant was provided a full hearing "in accordance with the beneficent purposes of the [Social Security] Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *see also Archbald v. Colvin*, 2015 WL 7294555, *3 (E.D.N.Y. 2015) ("[t]he reviewing court must ensure that 'all of the relevant facts [are] sufficiently developed and

considered'") (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 509 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010)).  The fact that a claimant is represented during the administrative hearing does not relieve the ALJ of his duty to develop the record.  *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) ("it is the well-established rule in our circuit" that such a duty exists "[e]ven when a claimant is represented by counsel").  On the other hand, where the record contains no obvious gaps and the ALJ possesses a "complete medical history," no additional efforts by the ALJ to further develop the record are required.  *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

In this case, as the ALJ himself noted at the hearing, the record did not contain treatment records of Grabowski's mental health treatment with Fitzgerald and Gawinski.[9] (Tr. 63, 87).  At the time of the hearing, Grabowski testified that she had been receiving mental health treatment biweekly for approximately one year.  (Tr. 63).  After hearing that testimony, the ALJ immediately interrupted the questioning to ask Grabowski's representative, "Do we have those records?"  (*Id.*).  The representative responded that the records were apparently not included in the record evidence.  (*Id.*).  After reconfirming with Grabowski that she had been treating every other week for a year, the ALJ stated, "I'm going to want those.  . . . So I'll hold the record open 30 days to get those."  (*Id.*).  At the conclusion of the hearing, the ALJ returned to the subject of the missing treatment records, emphasizing:

> I'm going to hold the record open for 30 days for receipt of the therapist notes.  I'd like to have the whole year's worth of treatment and all I've got is from 2013 in December and that's all I have.  So if you could get those to us I'll hold the record open. . . . It will be a little bit longer for me to get you a decision because we have to get the medical records.

(Tr. 87).

---

[9]  The record appears to reflect that the Commissioner never requested those records at the administrative level.  (*See* Tr. 92, 248).

30

Subsequent to the hearing, Grabowski's representative submitted additional records, which included records of four treatment sessions with Turnipseed during the fall of 2013. (Tr. 482-504). However, despite the regularity of her treatment with Fitzgerald (biweekly) and the comparative length and recency of that treatment (the preceding nearly twelve month period), no treatment records from Fitzgerald or Gawinski were submitted or made part of the administrative record. Nor did Grabowski's representative tender any explanation for their absence or request assistance by the ALJ to obtain them.

While "[t]he Second Circuit has indicated that the ALJ may rely on the claimant's counsel to obtain missing evidence under some circumstances, . . . it has stopped short of holding that the ALJ may delegate his or her duty to the claimant's counsel." *Sotososa v. Colvin*, 2016 WL 6517788, *4 (W.D.N.Y. 2016) (citing *Jordan v. Comm'r of Soc. Sec.*, 142 F. App'x 542, 543 (2d Cir. 2005) (summary order); *Frye v. Astrue*, 485 F. App'x 484, 488 n.2 (2d Cir. 2012) (summary order)). Indeed, as Chief Judge Geraci noted in *Sotososa*, "district courts in this circuit have reached conflicting conclusions as to whether the ALJ satisfies that duty by relying on the claimant's counsel to obtain the missing evidence." *Sotososa v. Colvin*, 2016 WL 6517788 at *4 (collecting cases).

I conclude that the circumstances of this case required the ALJ to do more to attempt to obtain the missing records than rely on Grabowski's representative. At the hearing, the ALJ himself acknowledged the importance of obtaining and reviewing the most recent, most regular, and most extended records of Grabowski's mental health treatment. Certainly, he was reasonable in directing Grabowski's non-attorney representative to obtain the records and in keeping the record open to accept them. However, when those records were not submitted, despite the post-hearing submission of other records, the ALJ should have followed up with

Grabowski's representative or attempted to obtain the missing records himself. *See*, *e.g.*, *Sotososa*, 2016 WL 6517788 at *4 (remanding case where record did not contain notes of claimant's biweekly mental health treatment with provider over one-year period; "this [c]ourt concludes that the ALJ did not satisfy his duty to develop the record even though he advised [claimant's] counsel to obtain the missing [mental health] treatment notes [where] [t]here is no evidence that the ALJ followed up with [claimant's] counsel or attempted to obtain the missing records himself"); *Ayer v. Astrue*, 2012 WL 381784, *6 (D. Vt. 2012) ("[t]he ALJ's failure to make an effort to obtain [medical] opinions [absent from the record], beyond holding the record open for the submission of "medical records" for thirty days after the hearing, is cause for remand"); *Curtis v. Astrue*, 2012 WL 6098258, *5 (N.D.N.Y.) (concluding that the ALJ had a duty to attempt to obtain treatment notes from physician, despite leaving the record open and counsel's assurance that such records would be submitted, because physician had "extended and regular treating relationship" with claimant and physician's opinion of claimant's limitations "was significantly at odds with the ALJ's [RFC determination]"), *report and recommendation adopted*, 2012 WL 6098256 (N.D.N.Y. 2012); *Newsome v. Astrue*, 817 F. Supp. 2d 111, 137 (E.D.N.Y. 2011) ("the fact that the ALJ requested additional information from the [p]laintiff's attorney and did not receive that information does not relieve the ALJ of his duty to fully develop the record").

   Apart from the ALJ's failure to satisfy his duty to develop the record, he also erred by discounting the April and September 2014 opinions of Fitzgerald and Gawinski on the grounds that they were not supported by treatment notes from them. An ALJ may not draw any adverse inference against a claimant because of the absence of treatment notes in the administrative record. *See*, *e.g.*, *Welch v. Colvin*, 2016 WL 836081, *12 (W.D.N.Y. 2016)

("[a]lthough not entirely clear, the ALJ's decision suggests that he discounted or did not credit the information in [the therapist's] letter because her treatment notes were not contained in the record . . . [;] [this] w[as] not [a] permissible reason[] to discount the information supplied by [the therapist], particularly without first contacting [the therapist] or attempting to obtain her treatment records"); *Jones v. Colvin*, 2015 WL 4628972, *5 (W.D.N.Y. 2015) (ALJ improperly drew adverse inference against claimant due to lack of treating physician opinion where the ALJ never requested an opinion from the treating physician) (citing *Jermyn v. Colvin*, 2015 WL 1298997, *20 (E.D.N.Y. 2015) ("[i]nstead of developing the record, the ALJ reached his RFC conclusion based, in part, on the absence of this information in the record[;] . . . the ALJ was not permitted to construe the silence in the record . . . as indicating support for his determination as to [p]laintiff's limitations")); *Curtis v. Astrue*, 2012 WL 6098258 at *5 (remanding to obtain physician's treatment notes on grounds, among other things, that ALJ discounted physician's opinion because it was not supported by clinical findings). *See also Gabrielsen v. Colvin*, 2015 WL 4597548, *6 (S.D.N.Y. 2015) (despite change in regulations governing duty to re-contact treating physician, "courts in the Second Circuit have concluded, citing these regulations, that the ALJ still has an obligation to re-contact the treating physician in some cases") (citing *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013), and *Ashley v. Comm'r of Soc. Sec.*, 2014 WL 7409594, *4 (N.D.N.Y. 2014)).

The ALJ's decision demonstrates that one of the reasons – indeed the first articulated – that he accorded "little weight" to the Fitzgerald and Gawinski opinions was because "they are not supported by treatment notes from any of the named providers." (Tr. 34). Moreover, the ALJ emphasized that it was "not apparent from treatment notes that any of them actually saw or treated" Grabowski. (*Id.*). The ALJ was wrong. Fitzgerald and Gawinski's

April 2014 opinion itself clearly reflects that Grabowski had been evaluated by Fitzgerald six times over three months. (Tr. 346). Other treatment notes contained in the record before the ALJ reflect that Grabowski's mental health treatment was transferred to a female counselor, Fitzgerald, in early 2014 and that Grabowski received regular counseling throughout that year. (Tr. 367-99, 504-05). The ALJ's erroneous factual statement suggests that he also discounted the providers' opinions on the incorrect assumption that none of them had personally evaluated Grabowski.

If the ALJ had requested and obtained the missing records, those treatment notes might well have altered the weight he accorded the Fitzgerald and Gawinski opinions. *See*, *e.g.*, *Bantle v. Colvin*, 2017 WL 726874, *9 (W.D.N.Y. 2017) ("[a]lthough it is unclear whether review of [mental health therapist's] notes would have persuaded the ALJ to give greater weight to [his] opinion, the notes would have eliminated the stated basis on which the ALJ discounted [his] opinion – that the opinion could not be credited in the absence of the notes"). Rather than assigning them "little weight" because they were unsupported by treatment records or evidence that the providers were personally familiar with Grabowski, he might have given them greater weight. Likewise, he might have altered the determination to accord "significant weight" to some of Lin's opinions, which he noted were "contradict[ed]" by the Fitzgerald and Gawinski opinions. (Tr. 34). *See*, *e.g.*, *Bantle v. Colvin*, 2017 WL 726874 at *10 ("if the ALJ had reviewed the additional records and altered the weight he accorded to [the mental health therapist's] opinions, . . . the ALJ might also have altered the weights he accorded to [the consultative examiner's opinion]") (citing *Ryder v. Colvin¸* 2015 WL 9077628, *5 (W.D.N.Y. 2015)); *Sotososa*, 2016 WL 6517788 at *3 ("if the ALJ had the additional [mental health] records before him, it is possible that he would have afforded less weight to [the consultative

psychiatric examiner's] opinion and reached a different RFC determination").  A modification in the weights assigned to the mental health opinions might also have altered the ALJ's RFC determination and could have affected his ultimate determination on disability.  For example, Fitzgerald and Gawinski opined that Grabowski was very limited in her ability to follow, understand and remember simple instructions and directions, and to maintain attention and concentration for role tasks – limitations that apparently were not accounted for in the ALJ's RFC.

On remand, the ALJ should attempt to obtain the missing treatment records, consider that evidence along with the other evidence of record, reevaluate the weight assigned to each opinion of record, and explain his reasons for discounting or rejecting any opinions. "Because further development of the record may affect the ALJ's determinations regarding [Grabowski's] credibility and capability, [Grabowski's] remaining arguments need not be considered at this time."[10] *Girolamo v. Colvin*, 2014 WL 2207993, *9 (W.D.N.Y. 2014).

## CONCLUSION

Accordingly, the Commissioner's motion for judgment on the pleadings **(Docket # 18)** is **DENIED**, and Grabowski's motion for judgment on the pleadings **(Docket # 15)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is

---

[10]  On remand, the ALJ may wish to clarify whether Grabowski's treating physicians had diagnosed her with chronic fatigue syndrome, despite the fact that she had not been evaluated by a rheumatologist, if the ALJ finds that the treatment records are unclear on this question.

remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
September 28, 2017